# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 7, 2006

## STATE OF TENNESSEE v. JERMAINE HUGHEY

**Appeal from the Criminal Court for Shelby County**
**Nos. 03-00283, 03-00284     Joseph B. Dailey, Judge**

---

**No. W2004-01074-CCA-R3-CD  - Filed July 18, 2006**

---

The defendant, Jermaine Hughey, was convicted of four counts of aggravated robbery, a Class B felony, and four counts of attempted aggravated robbery, a Class C felony. The trial court sentenced the defendant as a Range I, standard offender to eleven years for each aggravated robbery conviction and five years for each attempted aggravated robbery conviction. The trial court ordered (1) that in Case No. 03-00283, the three attempted aggravated robbery sentences be served concurrently to each other and consecutively to the aggravated robbery sentence, for a total sentence of sixteen years; (2) that in Case No. 03-00284, the three aggravated robbery and one attempted robbery sentences be served concurrently to each other, for a total sentence of eleven years; and (3) that the sentences in Case No. 03-00284 be served consecutively to the sentences in Case No. 03-00283, for an effective sentence of twenty-seven years in the Department of Correction. The defendant appeals claiming: (1) that the evidence was insufficient to support the verdict, (2) that the trial court erred in allowing the interpreter to participate in the trial, (3) that the trial court erred in allowing a witness's testimony and in not allowing the defendant to cross-examine witnesses about their immigrant status, (4) that the prosecutor made improper comments about the defendant's right to testify, (5) that the trial court erred in its instructions to the jury on lesser included offenses, and (6) that the trial court erred in sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Mark Albert Mesler, II, Memphis, Tennessee (on appeal), and Leslie Irwin Ballin, Memphis, Tennessee (at trial), for the appellant, Jermaine Hughey.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen Patrick Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's robbery of victims at an apartment complex on two different occasions. A Shelby County Grand Jury indicted the defendant on the following counts:

Case No. 03-00283 - Robbery on August 9, 2002

| Count | Offense | Victim[1] |
|---|---|---|
| 1 | Agg. Rob. - Weapon | Tirado |
| 2 | Agg. Rob. - Fear | Tirado |
| 3 | Agg. Rob. - Weapon | J. Torres |
| 4 | Agg. Rob. - Fear | J. Torres |
| 5 | Agg. Rob. - Weapon | E. Torres |
| 6 | Agg. Rob. - Fear | E. Torres |
| 7 | Attp. Agg. Rob. - Weapon | Gutierrez |

Case No. 03-00284 - Robbery on August 30, 2002

| Count | Offense | Victim |
|---|---|---|
| 1 | Agg. Rob. - Weapon | Villapando |
| 2 | Agg. Rob. - Fear | Villapando |
| 3 | Agg. Rob. - Weapon | Gutierrez |
| 4 | Agg. Rob. - Fear | Gutierrez |
| 5 | Agg. Rob. - Weapon | J. Torres |
| 6 | Agg. Rob. - Fear | J. Torres |
| 7 | Agg. Rob. - Weapon | E. Torres |
| 8 | Agg. Rob. - Fear | E. Torres |

At the trial, Sylvia Merediz worked as an interpreter for the witnesses who did not speak English. Ms. Merediz translated for Elpidio Aaron Savin Torres, Jose Yahir Cerda Gutierrez, and Jose Miguel Savin Torres.

Elpidio Aaron Savin Torres testified that he had lived in Memphis for three years and was from Mexico but was not an American citizen. He said that in August 2002, he was the victim of two robberies at his brother's apartment. He said that on August 9, 2002, between 11:00 a.m. and noon, he went to his brother's apartment to ask him about finding work. He said that he was in the bedroom with his brother, Jose Miguel Savin Torres, and that his sister-in-law, Maria Conception Tirado, was in the bathroom or kitchen. He said that his brother-in-law, Jose Yahir Cerda Gutierrez, was at the apartment and that Mr. Gutierrez told him he was going outside to smoke a cigarette. He said he was standing up to go outside with Mr. Gutierrez when he heard Mr. Gutierrez say, "We are f----- up. They want our money."

---

[1] In the indictments, the victims are referred to as Maria Tirado, Jose Savin, Eldidio [sic] Savin, Jose Cerda, and Carlos Villapando. We will refer to the victims by the names they stated when testifying: Maria Conception Tirado, Jose Miguel Savin Torres, Elpidio Aaron Savin Torres, Jose Yahir Cerda Gutierrez, and Carlos Villapando.

Elpidio Torres testified that a man with a small black gun told them to go inside and told his sister-in-law to come into the room. He said the man told them to get on the ground because "I believe he didn't want us to see him." He said that the man said, "Give me your wallet," and that he took out his wallet and showed the man it contained no money before giving the man ten dollars from his pocket. He said the man also took his cell phone and was pointing the gun at him. He said his sister-in-law spoke English and told the man they did not have any money because they were not working at the time. He said the man told them he was leaving and was going to count to ten. He said that as the man was counting and closing the door, his sister-in-law called the police. He said he did not recognize the man who robbed him at the time of the robbery. He said he was able to get a good look at the man inside the apartment and could see the man's face. He said that the man touched the door handle as he was leaving the apartment and that the police took fingerprints from the door handle. He said his sister-in-law translated for him when the police arrived.

Elpidio Torres testified that he again saw the man who robbed him on August 30, 2002, around 5:30 to 6:30 p.m., when the man robbed him a second time. He said that he and his brother were outside his brother's apartment talking to a neighbor about the previous robbery and that his brother was washing his truck. He said that he saw two black men and that he said, "Oh, oh, here they come again. They're either going to rob us or they're after us." He said that he knew it was the same man who had robbed him previously when he saw the man coming toward him and that he had no doubt it was the same man. He said that the man he recognized had a gun and that the other man did not have a weapon. He said the two men approached him, his brother, Mr. Gutierrez, and the neighbor who had been asking about the previous robbery. He said the two men frisked them and asked for their money. He said that he threw his wallet and that the robbers took seven or eight dollars. He said the man with the gun pointed it at him while the other man went through his pockets. He said he was fearful because "these things happen all the time. Sometimes they take your money and they still kill you." He said his sister-in-law was inside the apartment, and they told her to call the police. He identified the defendant in the courtroom as the man who robbed him twice.

Elpidio Torres testified that he saw the defendant after the second robbery when he and Mr. Gutierrez were in the parking lot of the apartment complex. He said that he saw the defendant walk over to the park and that he told his brother and sister-in-law that he had seen the man who robbed him twice. He said that a friend, Nacho, drove his brother and sister-in-law over to the park but that he did not go with them. He said that he did not see the police make an arrest and that he was not asked to identify anyone at the time. He said he gave a statement to the police and identified the defendant from two photographs. He said an interpreter who worked at the police department translated for him. He said he had no doubt the man he identified in the photograph, the defendant, was the man who robbed him.

On cross-examination, Elpidio Torres acknowledged he had testified he "glanced" four times at the defendant inside his brother's apartment. He said he also watched the defendant out of the corner of his eye. He said he saw the robber face-to-face when the robber was coming in but only saw a profile of the robber when he was picking up their wallets. He acknowledged his sister-in-law translated for him when the police asked him to describe the robber after the first robbery. He

acknowledged he told his brother and sister-in-law the man who robbed them was in the park with a cell phone and told them where to look.

Elpidio Torres acknowledged he went with his brother and sister-in-law to the police station to look at some photographs on September 6, 2002. He said that he identified the photograph of the defendant and that he was not present when his sister-in-law viewed the photographs and made an identification. He said his sister-in-law had not gone over his statement with him. He acknowledged that the day before he testified at the trial, he told his brother and sister-in-law that the defendant was "free" and not in jail because he had seen the defendant walking in the hallway. He denied talking to Mr. Gutierrez about identifying someone in court. He acknowledged the defendant was the only black man sitting in the courtroom where the accused normally would sit.

On re-direct examination, Elpidio Torres testified that he met with the assistant district attorney and Ms. Merediz, the interpreter, to discuss his testimony but that no one else was in the room. He said he and Mr. Gutierrez had seen the defendant in the hallway the day before while there was a break in the trial. He said that he recognized the defendant at the preliminary hearing and that he identified the defendant because he recognized the defendant as the man who robbed him and not because he was the man in the photograph he was shown.

Jose Yahir Cerda Gutierrez testified that he was from Mexico and had lived in Memphis for three and one-half years. He said that on August 9, 2002, he was living in an apartment with Ms. Tirado and Jose Torres, and Elpidio Torres was visiting. He said he went outside to smoke and saw a black man come from behind a car. He said that he first saw the man from about five to six meters away and that the man told him, "Give me your money," in English. He said that he was bending down and that the man pointed the gun at his head. He said he stood up, and the man reached into his pockets and took one dollar. He demonstrated how the man pushed him inside with the gun pointed at him. He said the man threw him onto the floor and asked for the other three victims' wallets. He said the man checked the other victims for money but only took money and a cell phone from Elpidio Torres. He said that he had never seen the robber before the robbery but that he saw the robber's face both inside and outside of the apartment.

Mr. Gutierrez testified that he saw the robber again when he was robbed a second time outside his apartment. He said he, Jose Torres, Elpidio Torres, and a neighbor were outside the apartment standing at the back of a truck. He said that he saw the defendant and another man come from the front of the truck and that the defendant had a gun. He said he recognized the defendant as the same man who had robbed him previously. He said the defendant pointed the gun at them while the other man checked their pockets. He said they took twenty dollars from him and took money from two of the other victims. He said that after they took the money, the two men walked away behind the apartment complex.

Mr. Gutierrez testified that he saw the defendant three or four days after the second robbery when the defendant walked in front of the car in which Mr. Gutierrez was riding. He said that the defendant was with three other people and that he walked to the park near the apartment complex.

He said he was approximately five to six meters away from the defendant and was surprised to see him. He said that Elpidio Torres told Ms. Tirado and Jose Torres about seeing the defendant and that he remained at the apartment while they went to see if it was the man who robbed them. He said he did not see the police arrest the defendant and was not asked to identify him at the apartment complex. He said that he gave a statement to the police at the police station and that an interpreter who worked at the office translated for him. He said the police officers showed him a photograph lineup with several pictures on one page and showed him an individual photograph. He said he was able to identify the man who robbed him because he would never forget him. He identified the defendant at the trial as the man who robbed him on both occasions. He said he was one "hundred percent" sure the defendant was the man who robbed him twice.

On cross-examination, Mr. Gutierrez testified that he had never seen the defendant before the first robbery. He said Elpidio Torres told Jose Torres and Ms. Tirado that they had seen the black man who robbed them in the park but did not say anything else to describe him. He acknowledged he identified the defendant's photograph on September 6, 2002. He also acknowledged a police officer showed him a six-photograph lineup on September 10, 2002, at his apartment. He acknowledged he told the police officer he was not sure if the picture he selected was the second robber from the second robbery. He acknowledged he identified the defendant at a previous hearing but was unable to identify the other robber. He said he was one-hundred percent sure the defendant was the man who robbed him.

Memphis Police Officer Patricia Turnmire testified that she worked for the crime-scene unit and that on August 9, 2002, between 11:20 a.m. and noon, she went to the Waterstone Landing Apartments to investigate a home invasion. She said she took photographs of the scene and fingerprinted the doorknob but found no fingerprints.

Memphis Police Sergeant Joseph Pearlman testified that he investigated two robberies on August 9 and 30, 2002, occurring at the same location. He said Ms. Tirado said she thought the robber lived in the apartment complex because she thought she had seen him before. He said he later received a telephone call from Ms. Tirado who said she had seen the man who robbed them. He said that he told her to watch the man until the police could get there and that she called back to say the police had arrested the man. He said they called the victims and asked them to come into the robbery office to give statements. He said that a clerk in the robbery office spoke Spanish and translated for them and that the victims were separated when they gave their statements and made photograph identifications. He said they showed the victims a single photograph because Ms. Tirado had identified the defendant to the police as the man who had robbed them. He said the photograph lineup shown to the victims contained a photograph of Deverance Bledsoe, the co-defendant, in the second robbery. He said the gun was never recovered from either robbery.

On cross-examination, Sergeant Pearlman acknowledged that he could have shown the victims a photograph lineup with the defendant instead of a single photograph but did not. He acknowledged he wrote in his report that Ms. Tirado, Jose Torres, and Mr. Gutierrez identified the defendant as the male who robbed them when the police arrived at the park. He said that when he

made the report, he asked Ms. Tirado if the other three victims had seen the person who was arrested and that Ms. Tirado said they had. He acknowledged he relied on Officer Cartwright's report on the first robbery to make his report. He acknowledged that he obtained a search warrant to search the defendant's apartment but that they did not find any money or weapons.

Memphis Police Officer John Morris testified that on September 2, 2002, around 4:00 p.m., he arrested the defendant after one of the victims called the police and reported seeing the man who robbed her. He said that he went to the Waterstone Landing Apartments and that a park was in the apartment complex. He said that he saw a black male that matched the description he had received over the radio and that he stopped the man and asked for his identification. He said that he called Sergeant Pearlman and that Sergeant Pearlman was talking to the victim. He said that the victim said she could see them and that the man they had was the person who robbed her. He said that he arrested the man and that he did not take the man over to the witness. He identified the defendant as the man he arrested. On cross-examination, Officer Morris acknowledged the defendant did not have a gun on him when he was arrested.

Memphis Police Officer Timothy Reynolds testified that he arrested the defendant for the second robbery at the defendant's apartment at Waterstone Apartments. He said that Deverance Bledsoe was there when the defendant was arrested but that he did not arrest Mr. Bledsoe until a week or two later. Officer Reynolds acknowledged that the defendant did not have a gun on his person and that he did not see a gun in plain view in the defendant's apartment.

Jose Miguel Savin Torres testified that he was from Baja, California, and southern Mexico and that he spoke a little English. He said that he lived in Memphis for approximately three and a half years and that he was robbed twice. He said that the first robbery occurred at his apartment on a Friday between 11:00 a.m. and noon and that his wife, his brother, and Mr. Gutierrez were there. He said he was in his bedroom when he saw Mr. Gutierrez walk in with "his face of fear." He said that a man with a gun asked for their wallets and that he threw his wallet on the floor. He said the robber picked it up, saw there was no money in it, and said, "I want money." He said the robber took money and a cell phone from his brother. He said he was looking at the robber the entire time until the robber told him to lie on the floor. He said that after the robber left, he called 9-1-1 and said, "I need help." He said he told the operator a man with a gun was inside his house. He said he gave the phone to his wife after the operator asked him a question he did not understand.

Jose Torres testified that he saw the robber again a week or two later when he was robbed a second time. He said that the robbery occurred around 6:00 p.m., that he was outside cleaning his truck, and that it was light outside. He said he, his brother, Mr. Gutierrez, and Mr. Villapando, were talking about the first robbery. He said the man who robbed him came up to them carrying a gun and told them to give him their money. He said that another man was with the robber and that the other man checked their pockets. He said he recognized the man with the gun as the man who had robbed him previously. He said the robbers took money from him.

-6-

Jose Torres testified that he again saw the man who robbed them at the park in his apartment. He said that his brother told him, "He's at the park," and that he recognized the man from the two robberies when he saw him in the park. He said his wife called the police on her cell phone and gave them a description of the man. He said he saw the police stop the man. He said that he went to the police station with the other victims to give a statement but that when he gave his statement only the police officer and a translator were there. He said that he spoke to the assistant district attorney the day before he testified and that his wife translated for him because Ms. Merediz was not there. He identified the defendant in the courtroom as the man who robbed him twice.

On cross-examination, Jose Torres acknowledged that he did not see money taken from Mr. Gutierrez during the first robbery. He said money was taken from his brother during the first robbery. He acknowledged his brother told him the man who robbed them was in the park and told him how the man was dressed. He said that he saw the police arrest the defendant and that he and his wife drove past the defendant while he was being arrested.

Maria Conception Tirado testified that she spoke both English and Spanish. She said that she had lived in Memphis and that she was the victim of a robbery. She said that Mr. Gutierrez walked into the apartment with someone behind him and that she thought he needed someone to translate for him. She said that when the black man turned, she saw he had a gun pointed at Mr. Gutierrez' ribs. She said the lighting in the apartment was clear, the blinds were open, and the lamp was on. She said the man told her to go into the kitchen, then called her into the hall, pushed her into the bedroom, and told her to lie on the floor. She said she told the man she could not lie on the floor because she was eight and a half months pregnant. She said that the man said, "Give me your f------ money" and that he had the gun pointed at them. She said the man took money and a cell phone from Elpidio Torres but did not take anything from anyone else in the room. She said the man may have taken something from Mr. Gutierrez when they were outside. She said that before leaving, the man said, "Count to ten, close your eyes, and do not say anything." She said that her husband called 9-1-1 and that she grabbed the phone from him once she heard the man leave the apartment. She said she was able to see the robber when he first walked in and during the robbery when she was two feet from him. She said that she recognized the robber from the apartment complex and that she told the police she had seen him around the apartments before.

Ms. Tirado testified that two or three weeks after the robbery, her husband, Jose Torres, ran into the house, locked the door, and said, "They robbed us again. Please call 9-1-1. It's the same guy." She said that two days after her husband was robbed the second time, Elpidio Torres told her, "The guy is in the park." She said her brother told her the man was wearing a brown shirt. She said that she and her husband went to the park in a friend's car and that she saw a group of men. She said that she looked at the man in the brown shirt and that she recognized him from the first robbery. She said she called 9-1-1 from a cell phone and gave the operator the report number for the robbery. She said that the police came and that she saw the police arrest the man. She said that she also called Sergeant Pearlman and that Sergeant Pearlman told her to give the police a sign that they had the right man. She said she gave a sign to one of the officers when they drove past the police car. She said that Sergeant Pearlman asked if she was sure it was the man and that she said she was.

Ms. Tirado testified that she gave a statement at the police station and that she was not with the other victims when she gave the statement. She said she did not translate for the other victims at the police station. She said she did translate during the week of the trial for the assistant district attorney when he was going over her husband's statement with her husband. She identified the defendant in the courtroom as the man who robbed her. On cross-examination, Ms. Tirado testified that she stared at the defendant for approximately five minutes while he was in the park until she knew he was the robber.

Before charging the jury, the trial court reduced six of the charges.

Case No. 03-00283 - Robbery on August 9, 2002

| Count | Charged Offense | Reduced To |
|---|---|---|
| 1 | Agg. Rob. - Weapon | Attp. Agg. Rob. - Weapon |
| 2 | Agg. Rob. - Fear | Attp. Agg. Rob. - Fear |
| 3 | Agg. Rob. - Weapon | Attp. Agg. Rob. - Weapon |
| 4 | Agg. Rob. - Fear | Attp. Agg. Rob. - Fear |

Case No. 03-00284 - Robbery on August 30, 2002

| Count | Offense | Reduced To |
|---|---|---|
| 1 | Agg. Rob. - Weapon | Attp. Agg. Rob. - Weapon |
| 2 | Agg. Rob. - Fear | Attp. Agg. Rob. - Fear |

The jury found the defendant guilty of all counts. The trial court merged seven of the counts into other counts.

Case No. 03-00283 - Robbery on August 9, 2002

| Count | Offense Charged to Jury | Verdict | Merged | Sentence |
|---|---|---|---|---|
| 1 | Attp. Agg. Rob. - Weapon | Guilty | | 5 years |
| 2 | Attp. Agg. Rob. - Fear | Guilty | Into Count 1 | |
| 3 | Attp. Agg. Rob. - Weapon | Guilty | | 5 years |
| 4 | Attp. Agg. Rob. - Fear | Guilty | Into Count 3 | |
| 5 | Agg. Rob. - Weapon | Guilty | | 11 years |
| 6 | Agg. Rob. - Fear | Guilty | Into Count 5 | |
| 7 | Attp. Agg. Rob. - Weapon | Guilty | | 5 years |

Case No. 03-00284 - Robbery August 30, 2002

| Count | Offense Charged to Jury | Verdict | Merged | Sentence |
|---|---|---|---|---|
| 1 | Attp. Agg. Rob. - Weapon | Guilty | | 5 years |
| 2 | Attp. Agg. Rob. - Fear | Guilty | Into Count 1 | |
| 3 | Agg. Rob. - Weapon | Guilty | | 11 years |
| 4 | Agg. Rob. - Fear | Guilty | Into Count 3 | |

| | | | | |
|---|---|---|---|---|
| 5 | Agg. Rob. - Weapon | Guilty | | 11 years |
| 6 | Agg. Rob. - Fear | Guilty | Into Count 5 | |
| 7 | Agg. Rob. - Weapon | Guilty | | 11 years |
| 8 | Agg. Rob. - Fear | Guilty | Into Count 7 | |

The trial court ordered the sentences in Counts 1, 3, and 7 to be served concurrently to each other and consecutively to Count 5, for an effective sentence of sixteen years in Case No. 03-00283. The trial court ordered the sentences in Counts 1, 3, 5, and 7 to be served concurrently to each other, for an effective sentence of eleven years in Case No. 03-00284. The trial court ordered the sixteen-year sentence in Case No. 03-00283 to be served consecutively to the eleven-year sentence in Case No. 03-00284, for a total sentence of twenty-seven years to be served as a Range I, standard offender.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that no rational trier of fact could conclude the defendant is guilty beyond a reasonable doubt. The defendant asserts that no physical evidence existed and that a gun was never located. He asserts the police found no evidence of the crimes in the defendant's apartment. He asserts several of the victims had trouble remembering how many perpetrators were involved in the first robbery. He asserts Sergeant Pearlman's reports state the victims were all on the porch during the first robbery, which differs from the testimony of the victims. He asserts the victims were together when they reported the crime, identified the defendant, and made their statements.

The state responds that the evidence was sufficient for a rational juror to find the defendant guilty beyond a reasonable doubt. The state notes that the four victims testified that the defendant robbed or attempted to rob them at gunpoint. The state argues that although minor differences existed in their testimony, the testimony was very similar, giving credibility to the state's version of the events. The state argues physical evidence is not a necessary prerequisite to find that sufficient evidence existed for the jury to find beyond a reasonable doubt that the defendant was guilty.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Aggravated robbery, as it applies to the facts of this case, is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably

believe it to be a deadly weapon." T.C.A. §§ 39-13-401, -402. To convict the defendant of the attempted aggravated robbery offenses, the state must prove that the defendant "[i]ntentionally engages in action or causes a result that would constitute [aggravated robbery] if the circumstances surrounding the conduct were as the person believes them to be." T.C.A. § 39-12-101(a)(1).

In the light most favorable to the state, the record supports the jury's verdicts that the defendant was guilty of aggravated robberies and attempted aggravated robberies on both occasions. The four victims of the first robbery testified that the defendant came into their apartment, pointed a gun at them, told them to lie on the floor, and demanded their money. The evidence showed the defendant took ten dollars and a cell phone from Elpidio Torres during the first robbery. Additionally, three of the four victims from the second robbery testified that the defendant and another man approached them outside the apartment. The evidence showed the defendant had a gun and pointed the gun at the victims during the second robbery while his accomplice checked the victims' pockets. Elpidio Torres testified the defendant took seven or eight dollars from him during the second robbery. Mr. Gutierrez testified the defendant took twenty dollars from him during the second robbery. Jose Torres testified that the defendant took money from him during the second robbery and that the defendant demanded money at gunpoint from Mr. Villapando, the fourth victim who did not testify. Elpidio Torres, Mr. Gutierrez, and Jose Torres testified they recognized the defendant during the second robbery as the man who had robbed them previously. They, along with Ms. Tirado, recognized the defendant when they saw him at the park of the apartment complex and called the police. We conclude that the evidence was sufficient for a rational juror to find beyond a reasonable doubt that the defendant committed the offenses of aggravated robbery of Elpidio Torres and attempted aggravated robbery of Mr. Gutierrez, Jose Torres, and Ms. Tirado in Case No. 03-00283 and aggravated robbery of Elpidio Torres, Mr. Gutierrez, and Jose Torres and attempted aggravated robbery of Mr. Villapando in Case No. 03-00284. The defendant is not entitled to relief on this issue.

## II. INTERPRETER

The defendant contends that the trial court erred in allowing the Spanish interpreter to participate in the trial because the interpreter had participated in pretrial meetings with the assistant district attorney and witnesses. The defendant asserts that he asked to call the interpreter as a witness to make a record of his complaint about her participation in the trial and to discuss her expected compensation but that his request was denied. The defendant notes that Canon 3 of Rule 41 of the Tennessee Rules of the Supreme Court states an interpreter "shall be impartial and unbiased and shall refrain from conduct that may give an appearance of bias." He claims the interpreter's meeting with the assistant district attorney and the witnesses before the trial interfered with the objectivity of the interpreter under Canon 3. He also argues that the interpreter should have declared in open court the conflict and allowed the trial court to determine if she could serve.

The state responds that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial. The state asserts the defendant failed to specify what actions by the interpreter were improper. The state argues that the only possible conflict the interpreter could have had was

that she was "involved in pretrial conferences with the state" and that although she did not disclose this alleged conflict, the trial court determined the interpreter could serve in this case. The state also contends that no rule exists barring an interpreter from assisting either party and serving as the official court interpreter.

At the conclusion of Elpidio Torres' testimony, the defendant requested a mistrial because it "doesn't feel right to have the official interpreter to be involved in pretrial conferences with the state," and it violates the defendant's due process rights. The trial court found that

> [I]n a perfect world, the state has its own employee that serves as an interpreter, but she [left] the office
>
> . . . .
>
> [The interpreter] - is a - in fact the only, at the present time, state-certified court interpreter - is an extremely professional individual and has taken an oath to translate accurately to the best of her ability, and I have absolutely no reason, whatsoever, to suspect that she would not do so. And I guess the jury, at this point, knows that she assisted [the assistant district attorney] yesterday in the translation in the pretrial matters, but that's, I think, fairly inconsequential in the whole scheme of things[.]

Canon 3 of Rule 41 of the Tennessee Rules of the Supreme Court addresses the impartiality and avoidance of conflicts of interest for foreign language interpreters in Tennessee courts. It states in pertinent part that

> Whenever an interpreter has an actual or apparent conflict of interest, the interpreter shall declare in open court before appointment such conflict and let the court determine whether the interpreter may serve in the case.

Tenn. Sup. Ct. R. 41, Canon 3.

The trial court's appointment of an interpreter for a witness in a criminal case is a matter for the trial court's discretion and is subject to reversal only for an abuse of discretion. State v. Millsaps, 30 S.W.3d 364, 370 (Tenn. Crim. App. 2000). "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997) (applying abuse of discretion standard on trial court's decision not to allow expert to testify). A defendant contending that a translation was inaccurate must prove prejudice, and this court will not speculate about the accuracy of the translation. Millsaps, 30 S.W.3d at 370.

The interpreter in this case should have disclosed to the trial court that she had translated for the assistant district attorney during pretrial meetings with the victims. However, the record reflects that the trial court addressed the possible conflict after the testimony of the first witness. We acknowledge that the defense attorney asked the trial court to allow him to make a record of the interpreter's involvement of the proceedings and that the trial court denied the request. However, the defense attorney first raised the issue at the end of the day on November 19, 2003, when he objected because something "didn't feel right" and did not state why the defendant would be prejudiced by the interpreter translating during the trial. The trial court ruled on the objection and placed its findings in the record. It was not until the end of the next day on November 20, 2003, that the defense counsel requested to be able to make a record of the interpreter's involvement, and by that time, two more Spanish-speaking victims had testified. The trial court found the interpreter was the only state certified interpreter, she had taken an oath to translate truthfully, and the court had no reason to believe she was not translating truthfully. Additionally, the defendant has not demonstrated or even alleged the translation was inaccurate. We conclude the trial court did not abuse its discretion in allowing the interpreter to translate at the trial.

### III. WITNESS TESTIMONY

The defendant contends that the trial court erred in allowing Elpidio Torres to testify about other robberies involving Hispanic victims and to testify about the defendant's state of mind. The defendant also contends the trial court erred by not allowing the defendant to question witnesses about their status in this country. The state asserts the trial court committed no error in allowing the testimony of Elpidio Torres. It also asserts the trial court properly sustained the state's objection to the defendant's asking Elpidio Torres if he was in the United States on a current work visa.

### A. Testimony by Elpidio Torres

The defendant asserts the trial court erred in allowing Elpidio Torres to testify that he "believe[d] [the defendant] didn't want us to see him" and that "I didn't want to look at him because I didn't think he wanted me to look at him," because these statements called for speculation. He also asserts the trial court erred in allowing Elpidio Torres to testify that at the time of the robbery, he was feeling "fear - what one feels because these things happen all the time. Sometimes they take your money and they still kill you." He asserts that the comments became increasingly prejudicial and that the trial court's allowing the statements led the witness to believe that he was allowed to answer questions inappropriately. He asserts that Elpidio Torres answered in response to a question on cross-examination that "it's not wasting my time because this has happened to a lot of us Mexicans/Hispanics," and that this comment was not appropriate or relevant and was made to inflame the jury.

The state contends that the trial court did not err concerning the testimony of Elpidio Torres. The state asserts the witness testified about his own state of mind, not the defendant's, when he said he believed the defendant did not want them to look at him. The state also asserts the witness's statement that robbers sometimes kill victims was relevant because the witness's believing that made

-12-

it more likely that he was placed in fear. The state asserts that if the trial court erred in allowing either of these two statements, the error was harmless beyond a reasonable doubt given the weight of the evidence. The state asserts the defendant waived the issue regarding the statement by the witness that "this happened to a lot of us Mexicans" for failing to object, failing to ask for it to be stricken from the record, failing to ask for a curative instruction, and failing to request a mistrial.

According to Rule 401 of the Tennessee Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The trial court has discretion in determining if evidence meets the test for relevancy. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Assessing the probative value and danger of unfair prejudice regarding the evidence also falls within the trial court's discretion. State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). This court will only reverse a trial court's decision if the trial court abused that discretion. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

We first note that the defendant failed to take any corrective action or to object to Elpidio Torres' statement during cross-examination that "this happened to a lot of us Mexicans." Therefore, he has waived this issue. See T.R.A.P. 36(a) (relief is not required if a party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error").

The defendant contests the evidence relating to Elpidio Torres' testimony regarding his belief that the defendant did not want him or the other victims to look at the defendant. The state asked Elpidio Torres how he felt when he saw the robber with the gun, asked why he gave the defendant his money, and asked about his ability to see the defendant during the robbery. The victim responded that "I believe he didn't want us to see him" and that "I didn't want to look at him because I didn't think he wanted me to look at him." The record reflects the defendant's attorney objected the first time "to what he believes." The trial court overruled the objection. The record reflects the witness was explaining why he did not want to look at the defendant and was not testifying to the defendant's state of mind. We conclude that the testimony was relevant to the witness's description of the robbery and his ability to see the defendant and that the trial court did not abuse its discretion in allowing the testimony.

Next, the defendant contests the evidence relating to Elpidio Torres' testimony regarding robberies of other Hispanics. In response to the prosecutor's question, "What were you feeling?" Elpidio Torres responded, "It was fear - what one feels because these things happen all the time. Sometimes they take your money and they still kill you." The defendant objected "to what they do other times." The trial court overruled the objection "to the extent it satisfies one of the elements of the offense." Fear is one of the elements of aggravated robbery. See T.C.A. §§ 39-13-401, -402. Fear may be presumed from facts indicating sufficient cause for fear. Sloan v. State, 491 S.W.2d 858, 861 (Tenn. Crim. App. 1972). The witness responded to the question by stating he felt fear

and explained why he felt the fear. We conclude that this testimony was relevant to explain the witness's fear and that the trial court did not abuse its discretion in allowing this testimony.

## B. Immigrant Status of Witnesses

The defendant contends the trial court erred by not allowing the defendant to question witnesses about their status in this country because the question had a good faith basis and was relevant to prior bad acts of the witnesses. He argues that if a person is legally in the country, it is probative of truthfulness, because if the person is here illegally, he or she is "lying everyday." He asserts the trial court failed to conduct a hearing outside the presence of the jury as required by the rule.

The state asserts that the defendant did not request a jury-out hearing on this issue. The state argues the witnesses' work status in the United States was not relevant under Rule 401 of the Tennessee Rules of Evidence. The state asserts that because the defendant failed to request a jury-out hearing, "neither the State nor this Court knows" if Elpidio Torres was in the country illegally. The state also argues that an immigrant's illegal work status is not probative of truthfulness. The state compares an illegal work status to criminal trespass, which this court has stated does not involve dishonesty. See State v. Philpott, 882 S.W.2d 394, 403 n.16 (Tenn. Crim. App. 1994). The state asserts the defendant failed to cite any authority in which a court has found that a witness's illegal status in the United States was probative of the witness's character for truthfulness. The state contends that if the trial court did err, the error was harmless beyond a reasonable doubt.

The record reflects that on cross-examination the defendant's attorney asked Elpidio Torres, "Are you here on a current work visa?" The prosecutor asked to approach the judge, and a bench conference was held.

| [STATE]: | Object to relevance. |
|---|---|
| [DEFENDANT]: | It was made relevant by [the state] asking if he was a citizen. |
| [STATE]: | It goes to explain his language. The purpose he's here and whether or not he's legal or not is irrelevant. |
| [DEFENDANT]: | He can explain language by asking the question, "Do you speak English?" |
| [COURT]: | I agree with that, and I agree that the question regarding citizenship may not have been relevant, but there was no objection to that, |

-14-

|  |  | and I don't see any relevance to going any deeper into it. |
|---|---|---|
| [DEFENDANT]: | | But I say it's now become relevant based on the direct examination - |
| [COURT]: | | Well, had there been an objection at the time, I might have sustained it - in all likelihood I would have sustained it; but at this point, I just don't think it's relevant, and I'll sustain - |
| [DEFENDANT]: | | And I apologize if I didn't make my point clear. I didn't object, and I'm not suggesting that I'm objecting now; but because the state put it into relevance, and that is the reason I want to ask about his status here is because [the state] asked, on direct, whether or not he was a citizen of this country. |
| [COURT]: | | And he said he was not. There's no need to go any further. |

"The propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the sound discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); see also Coffee v. State, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463; see State v. Fowler, 373 S.W.2d 460, 466 (Tenn. 1963).

According to Rule 401 of the Tennessee Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." See Tenn. R. Evid. 402. Relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. A trial court has the discretion to determine if evidence meets the test for relevancy. Forbes, 918 S.W.2d at 449.

Pursuant to Rule 608(b) of the Tennessee Rules of Evidence, specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the

-15-

witness's character for truthfulness or untruthfulness. Before a witness can be questioned about the specific instance of conduct, the trial court, <u>upon request</u>, must hold a hearing to determine if "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1).

We first note that the defendant did not request that the trial court conduct a hearing to determine the probative value of Elpidio Torres' immigration status and that it was the defendant's responsibility to request such a hearing. Additionally, the defendant did not argue that Elpidio Torres' immigrant status was probative of truthfulness but simply argued that it was relevant based on the witness's direct examination. The defendant now argues on appeal that this evidence was relevant under Rule 608 because it was probative of the witness's truthfulness. "As a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." <u>State v. Leach</u>, 148 S.W.3d 42, 55 (Tenn. 2004). The trial court concluded that the witness's immigrant status in this country was not relevant to the issues on trial. We cannot conclude that the trial court abused its discretion. The defendant is not entitled to relief on this issue.

## IV. PROSECUTOR'S STATEMENTS

The defendant contends the trial court erred in allowing the prosecutor to make improper comments during voir dire and in closing arguments. The state responds that the trial court did not err in allowing the state's comments during voir dire about the defendant's right to testify or in allowing the prosecutor's statements in closing argument.

### A. Voir Dire

The defendant contends the trial court erred by allowing the prosecutor to make improper comments during the voir dire process about the defendant's right not to testify. He claims that any adverse comment made by the prosecutor upon failure of the defendant to testify constitutes a violation of the defendant's rights. He contends the violation is reversible error unless the trial judge requires counsel to stop and properly instructs the jury.

The state responds that the trial court properly allowed the prosecutor to make comments during voir dire that the defendant was not required to testify at the trial. The state asserts that the defendant did not contemporaneously object to the prosecutor's comments and did not ask the court for a curative instruction. The state argues that the comment was harmless beyond a reasonable doubt given the context in which it was made. It asserts the prosecutor's intent in making the statement was to impress on the jury that if the defendant chose to testify, his credibility should be judged the same as any other witness. The state asserts the defendant objected only after the prosecutor mentioned the defendant's right to testify three times. The state asserts the trial court charged the jury before deliberations about the defendant's right not to testify.

During voir dire, the assistant district attorney made the following statements regarding the defendant's right not to testify:

-16-

The defendant doesn't have to prove anything. Does everybody agree that's fair.

. . . .

That the defendant shouldn't have to prove he's innocent?

. . . .

Does that mean he can't put on proof?

. . . .

No. He doesn't have the burden of proof. He doesn't have to prove anything, but that doesn't mean he can't put on proof.

. . . .

If the defense puts on proof - calls witnesses to the stand - do you use different rules for judging the witnesses' - their witnesses' credibility than you do for the State of Tennessee's witnesses? Do you use different rules? No. You use the same rules for judging the credibility of witnesses for both sides.

. . . .

The defense doesn't have to put on any proof. The defendant doesn't have to testify. Judge Dailey will tell you what you already know, I submit. Has anybody ever heard that - the right to remain silent?

. . . .

I submit the defendant does not have to testify, and Judge Dailey will tell you what the law is. If he doesn't, you cannot hold that against him because he doesn't have the burden of proof. That's fair, right?

. . . .

Does that mean he can't testify? No.

The defense attorney then asked the court for a bench conference and objected to the "last few questions about does it mean he doesn't need - can't testify - doesn't have to testify - tends to comment on the shifting of the burden of proof." The trial court told the defense attorney, "You can certainly - if you feel as though it's been misstated, you can clarify when you get up to address the jury." The assistant district attorney then continued in his voir dire stating that

> The state has the burden of proof, and the defense doesn't have to put on any proof. The defendant doesn't have to testify. He doesn't. You cannot hold that against him. If he does choose to testify, do you use different rules to judge his credibility? No. Does he get bonus points for taking the stand when he doesn't have to? No. You use the same rules for both sides.

Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining if the prosecutor's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

See also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

The prosecutor's comments during voir dire were not improper. The prosecutor's statements were made to determine if the potential jurors could weigh the credibility of the defendant's testimony, if he testified, in the same way it would weigh any other witness's credibility. Additionally, the trial court gave the jury an instruction regarding the defendant's right not to testify in the jury charge. We conclude the trial court did not err in allowing the prosecutor's statements during voir dire. The defendant is not entitled to relief on this issue.

B. Closing Argument

The defendant also contends the trial court erred by allowing the state to argue in closing that "this happens to Mexicans all the time," because the argument had no legitimate purpose and could only serve to inflame the jury. He asserts the state's closing argument asked the jury to consider helping Hispanic victims vindicate the crimes committed against them. He claims that the intent of the prosecutor was improper and that the cumulative effect of the errors at the trial is undeniable.

The state argues that the trial court did not abuse its discretion in overruling the defendant's objection to the prosecutor's closing argument about the testimony of Elpidio Torres. The state asserts the defendant did not make a specific objection and did not seek a curative instruction during the closing argument. The state asserts the prosecutor's sole intent in making the statements was to remind the jury how serious Elpidio Torres viewed the crimes committed against him and the other victims. The state also asserts the case against the defendant was very strong and argues that if the prosecutor's statements are determined to have been improper, they did not affect the verdict to the defendant's detriment. The state asserts that its finding the lesser included offenses in four of the charges reflects that the jury was not "so inflamed" that it spared the defendant no mercy.

During the state's rebuttal in closing argument, the prosecutor argued that

> [The defendant's attorney] asked, "Why are we here?" He asked, "Why are you all here?" . . . why are [the victims] here? They're not making any money being here either. They're not able to work and earn money while they're sitting here out in the witness room waiting day after day after day to come in here. What do they have to gain from this?

> [Elpidio Torres] told you - when [the defendant's attorney] asked him, "Don't you think this is serious?" He said, "Yes, this is serious. This is serious because we're seeking justice because this happens to us all the time."

The defendant's attorney then said, "Object. Your Honor." The trial court immediately responded, "Overruled." The prosecutor continued arguing that

> "This happens to us Mexicans all the time." And they're not just wanting to get anybody, because they didn't - to spite their chance. They're wanting to hold those responsible that are responsible - the people - or the person in this case - him- that they told you, without any doubt in their mind, the guy with the gun from both occasions.

Shortly after the defendant's objection, the trial court sent the jury out of the courtroom for a recess. The trial court explained its reasoning in overruling the defendant's objection.

Just to elaborate a little bit on my ruling on this last objection. I didn't really want to interrupt the argument as it was going on, but I did see [the defendant's attorney] -

So in the event [the defendant] is convicted and this matter goes up, the reason why I thought his argument was entirely appropriate is that in rebuttal or response what [the defendant's attorney] had argued; that "Use your common sense. Why would anyone who lives in this apartment complex rob someone not only once but why would they rob them twice and then just hang out three days later in the same apartment complex where the victims were known to live. And I think it's a perfectly reasonable inference from the facts and the testimony in the case that common sense would suggest that the victims are Hispanic and may be easy prey - whose employment status may not be certain - who may be reluctant to report - who may have cash on Fridays; that under these circumstances, it may well make common sense. It's up to the jury to determine, but I think that's an appropriate response by the state to what was argued by the defense.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976).

The record reveals that the defense attorney argued in his closing argument that the defendant would not have committed a crime in the apartment complex where he lived because he would be seen there on a regular basis. The prosecutor repeated the testimony of Elpidio Torres that, "This happens to us Mexicans all the time," to rebut the defense's argument that common sense tells you the defendant would not have committed the crime in his own apartment complex. The trial court overruled the defendant's objection and did not give a curative instruction during the closing argument. However, the trial court did instruct the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements are made that you believe are not supported by the evidence, you should disregard them." Additionally, taking the statement in context with all of the proof and the arguments, we cannot say that the statement affected the verdict. The defendant is not entitled to relief on this issue.

# V. LESSER INCLUDED OFFENSES

The defendant contends that the trial court erred in refusing to charge the jury with theft of property as a lesser included offense of aggravated robbery because the facts supported the instruction. The defendant claims he was not required to request the instruction in writing. The state concedes theft of property is a lesser included offense of aggravated robbery. The state asserts that the defendant presented no evidence contesting the fact that a deadly weapon was used in the robberies and that there was overwhelming proof a gun was used. The state contends that the trial court's failure to instruct the jury as to theft of property as a lesser included offense of aggravated robbery was harmless beyond a reasonable doubt.

The record reflects that the defendant requested the jury instruction on theft of property in open court and that he did not make the request in writing. The trial court denied the defendant's request to charge theft of property as a lesser included offense stating that

> Well, I'm not going to for several reasons. It wasn't requested in writing as the rules now require. And since this case, from the outset, has been one involving the question of identity - there was even a statement from [the defendant's attorney], respectfully, early on to the jury that the defense is not contesting that these people were robbed. The only question is one of identity; that under any of the case law - any reasonable examination of what should be charged, nothing below robbery would be appropriate factually[.]

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Tennessee Code Annotated section 40-18-110(c) provides

> Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, such instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

In State v. Page, our supreme court held that Tennessee Code Annotated section 40-18-110(c) does not violate a defendant's right to trial by jury. 184 S.W.3d 223, 231 (Tenn. 2006). The court also held "that by failing to request such an instruction, the defendant waived his right to seek plenary appellate review of the issue." Id. However, the statute does not preclude plain error review. Id. at 230-31.

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:

An offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>>
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67.

If an offense is a lesser included offense, then the trial court must conduct the following two-step analysis in order to determine if the lesser included offense instruction should be given:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469.

Theft of property occurs when a "person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Theft of property is a lesser included offense of aggravated robbery under part (a) of the Burns test. See State v. Bowles, 52 S.W.3d 69, 79-80 (Tenn. 2001) (holding that theft is a lesser included offense of robbery); State v. Lewis, 36 S.W.3d 88, 99-100 (Tenn. Crim. App. 2000) (stating theft of property is a Burns part (a) lesser included offense of attempted robbery); State v. Curtis Buford, No. W2003-00370-CCA-R3-CD, Shelby County, slip op. at 7 (Tenn. Crim. App. Mar. 2, 2004), app. denied (Tenn. Sept. 13, 2004) (theft of property is included in the definition of aggravated robbery and is a lesser included offense).

"Evidence sufficient to warrant an instruction on the greater offense will also support an instruction on a lesser offense under part (a) of the Burns test. In proving the greater offense, the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater." State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002). The trial court must give a lesser included offense instruction that is supported by the evidence even if the instruction would be inconsistent with the theories of the state and defense. State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002). Therefore, the trial court erred in failing to give an instruction on the lesser included offense of theft of property.

If a trial court improperly omits a lesser included offense instruction, then constitutional harmless error analysis applies and this court must determine if the error did not affect the outcome of the trial beyond a reasonable doubt. State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001). "In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Allen, 69 S.W.3d at 191.

The supreme court has held that when a jury convicts on the greater offense to the exclusion of the immediately lesser included offense, the error in failing to instruct will normally be harmless beyond a reasonable doubt. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). The trial court instructed the jury on the charged offenses of aggravated robbery and the immediately lesser included offense of robbery. The jury chose to convict the defendant of the greater offenses. Therefore, consideration of the trial court's error is not necessary to do substantial justice, and the defendant is not entitled to relief on this issue.

## VI. SENTENCING

The defendant contends that the trial court erred in applying enhancement factors and in ordering consecutive sentencing. The state responds that the defendant waived review of sentencing for failing to include in the record a copy of the presentence report and copies of the letters written on the defendant's behalf. It asserts the state made it clear it was relying on the presentence report, referring to it five times during the sentencing hearing. It asserts the defendant has the burden of showing that sentencing is improper and must provide this court with all the materials it must have to conduct a de novo review. The state also argues the trial court properly sentenced the defendant.

At the sentencing hearing, Memphis Police Detective Miguel Aguila testified that in the last few years, targeting Hispanics to be victims of crimes had become common. He said that approximately eighty percent of the home invasion robberies he had investigated involved Hispanic victims. He said the language barrier created special problems in catching and prosecuting the suspects. He said Hispanic victims were reluctant to report crimes because they had difficulty in communicating. He said he had investigated some cases where the victims were victimized two, three, or four times. He said that there was "a percentage of illegal residents" in Memphis and that they were hesitant to call the police because they were afraid of deportation. He said that the majority of Hispanic victims save the money they get paid once a week and that at the end of the month, they mail the money to their families in Mexico. He said the members of the Hispanic community were being targeted because of their racial and language differences.

The state told the trial court it would rely on the defendant's presentence report and did not present any further proof. The presentence report was not introduced as an exhibit. The presentence report also has not been included in the record. The defendant submitted thirteen letters written on behalf of the defendant to the trial court but did not enter those letters as exhibits. The letters also have not been included in the record.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2003).[2] As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

---

[2] We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102, -114, -210, and -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994). Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range for a Class B felony or Class C felony unless there are enhancement factors present. T.C.A. § 40-35-210(c) (2003). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e) (2003). The weight to be afforded an existing factor is left to the trial court's discretion as long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210 (2003), Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Initially we note that the defendant has hampered our de novo review by failing to include the presentence report in the record on appeal. It is incumbent upon the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired relative to the issues on appeal. T.R.A.P. 24(b); State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). This rule applies to sentencing hearings. State v. Beech, 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987). In the absence of an appropriate record, we must presume that the trial court's determinations are correct. See, e.g., State v. Meeks, 779 S.W.2d 394, 397 (Tenn. Crim. App. 1988); Beech, 744 S.W.2d at 588.

## A. Application of Enhancement and Mitigating Factors

The defendant asserts the trial court imposed an excessive sentence because he had a minimal criminal history. He acknowledges the trial court considered the enhancement and mitigating factors submitted by the parties but asserts the trial court did not apply the sentencing principles. The defendant asserts that he had only two prior simple possession of marijuana charges. The defendant asserts the trial court erred in applying enhancement factor (3), that the defendant was "a leader in the commission of the offense involving two (2) or more actors," to both robberies. See T.C.A. § 40-35-114(3). The state asserts the trial court correctly applied the three enhancement factors.

The trial court found that the following enhancement factors applied: (2) the defendant had a previous history of criminal convictions or criminal behavior, (3) the defendant was the leader in the commission of the offense, and (23) the defendant intentionally selected the victims in whole or in part because of the defendant's "belief or perception regarding the race . . . national origin, ancestry or gender" of the victims. See T.C.A. § 40-35-114(2), (3), (23). The trial court applied enhancement factor (2) based upon proof that the defendant "does have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." In applying enhancement factor (3), the trial court found the defendant was "obviously the one that

-25-

set up the robbery and targeted these victims because he was the one who robbed them three or four weeks earlier." In applying enhancement factor (23), the trial court found this factor to be the most important of all the enhancement factors based on the testimony that had been presented at the sentencing hearing.

The defendant presented three mitigating factors for consideration by the trial court: (1) the defendant's conduct did not threaten or cause bodily injury; (6) the defendant, because of his youth lacked substantial judgment in committing the offense; and (13) the defendant had a minimal criminal history. See T.C.A. § 40-35-113(1), (6), (13). The trial court rejected all three mitigating factors. The trial court found the defendant did not qualify as a youth because he was twenty-one or twenty-two years old. It found that although shots were not fired, shots were threatened, and the victims' lives were threatened. The trial court made no specific finding on the minimal criminal history not being a mitigating factor.

With regard to enhancement factor (2), that the defendant had a history of criminal convictions or criminal behavior, we must presume that the trial court's application was proper because of the absence of the defendant's presentence report from the record. With regard to enhancement factor (23), that the defendant selected the victims based on their race or national origin, the defendant did not assert that this enhancement factor was incorrectly applied. The state presented evidence at the sentencing hearing about Hispanics being the targets of robberies. The record reflects the defendant lived in the same apartment complex and targeted these particular victims on two different occasions. The trial court stated that

> But the obvious counter to that is he did go back and rob the same people a second time because they were Hispanic, because he knew or thought he knew, he felt that they wouldn't report it and he would be home free because they were Hispanic.

We conclude that enhancement factor (23) was properly applied by the trial court.

With regard to enhancement factor (3), that the defendant was the leader in the commission of the offense, the defendant contends the trial court should not have applied this factor to the first robbery. We agree with the defendant that this factor does not apply to the first robbery. The trial court found that the three enhancement factors applied and applied the three factors to all convictions. The trial court did not distinguish between the convictions for the first robbery in Case No. 03-00283 and the convictions for the second robbery in Case No. 03-00284. All four of the victims testified that one man, the defendant, robbed them on the first occasion. We conclude enhancement factor (3) does not apply to Case No. 03-00283.

We conclude that the mitigating factors (1), (6), and (13) do not apply in this case. The defendant did threaten serious bodily injury by pointing a gun at the victims and demanding the victims give them money, therefore, mitigating factor (1) does not apply. See State v. William Ramsey, No. M2001-02735-CCA-R3-CD, Warren County, slip op. at 19 (Tenn. Crim. App. July 15, 2003) (concluding mitigating factor (1) did not apply in an aggravated robbery case when the co-

defendant threatened the victim's life with a knife). With regard to mitigating factor (6), that because of defendant's youth he lacked substantial judgment in committing the offense, the record reflects the defendant was twenty-four years old when he committed the robberies. We have no other information regarding the defendant's education, experience, or mental health because the presentence report was not included in the record. Therefore, we must presume that the trial court's rejection of mitigating factor (6) was correct. With regard to mitigating factor (13), that the defendant had a minimal criminal history, we also must presume that the trial court's rejection of mitigating factor (13) was proper because of the absence of the defendant's presentence report from the record.

We conclude that the trial court properly applied the enhancement factors to the conviction arising from the second robbery in Case No. 03-00284. However, we conclude that the trial court improperly applied enhancement factor (3) to the convictions arising from the first robbery in Case No. 03-00283. We note that the trial court stressed that enhancement factor (23) was the most important of the three enhancement factors it applied and that the trial court did not say how much weight it gave to the other two factors. Because the presentence report was not included in the record on appeal, we are unable to conduct a full de novo review of the sentences in Case No. 03-00283. In the absence of an appropriate record, we must presume that the trial court's determinations are correct. See e.g., Meeks, 779 S.W.2d at 397; Beech, 744 S.W.2d at 588. The defendant is not entitled to relief on this issue.

## B. Consecutive Sentencing

The defendant acknowledges it is hard to argue that the two cases should not run consecutively but asserts the trial court erred in ordering the aggravated robbery in Case No. 03-00283 of the first indictment to run consecutively to all the other sentences. He contends that the trial court erred in finding the defendant was a dangerous offender whose actions indicated little or no regard for human life and that the trial court did not consider the fact that no shots were fired and no one was injured. He argues that there was nothing extraordinary about the crimes and that the defendant has no history to lead the trial court to believe consecutive sentencing is necessary to protect the public.

The state contends the trial court properly sentenced the defendant. It argues that the trial court properly found the defendant was a dangerous offender whose behavior indicates little or no regard for human life and that consecutive sentencing was reasonably related to the severity of the offenses and necessary to protect the public. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

The trial court found that the two cases No. 03-00283 and No. 03-00284 should be served consecutively because the defendant was a dangerous criminal and from a public policy standpoint the cases should be consecutive. It stated that

> [F]actoring in what I think is a clear and fair conclusion from the
> facts of this case, factoring in the fact that he targeted these people

-27-

because they were Hispanics and certainly targeted them the second time for that reason, this makes him a particularly dangerous offender.

. . . .

I think that makes him a particularly dangerous offender to be of a mind-set to commit this type of offense against these victims, same place, same place where he lives, short period of time. I think in my opinion makes this factor apply.

And then the remaining two factors, consecutive sentences reasonably relate to the severity of the offenses and are necessary in order to protect the public from further serious conduct by this defendant. I think they apply as well when you read the transcript and review the facts of this case and the unique circumstances of the victims.

. . . If a person were allowed to commit an aggravated robbery and then go commit another one and commit another one and commit another one and serve concurrent time for it all, then there would be no deterrent at all from committing additional offenses.

The trial court also found that the three attempted aggravated robbery convictions should be served consecutively to the aggravated robbery conviction in Case No. 03-00283. The trial court stated that

[T]he one instance in which I think should be consecutive time is that first offense where he confronted [the victim] on the outside smoking a cigarette and forced him at gunpoint to go back inside the apartment. He could have completed his robbery then and there and left. But he elected to force this man back into the apartment where these many people were and continue the robbery. So I think that that offense should be served for the same reason as I indicated with regard to the two sets of offenses consecutively.

The defendant acknowledges, "it is hard to argue that separate incidents should not be sentenced in a consecutive manner." The defendant robbed four victims at gunpoint and later robbed three of the same victims again at gunpoint. During the first robbery, the defendant forced Mr. Gutierrez inside the apartment. He told the victims, including a pregnant woman, to lie down on the floor and demanded their money. During the second robbery, the defendant, along with an accomplice, walked up to the four victims in the middle of the apartment complex's parking lot. The defendant pointed a gun at the victims while his accomplice went through the victims' pockets. The trial court noted the "brazenness" and "arrogance" involved in robbing people living in his own apartment complex where he knew the victims would see him again. The trial court found that the

-28-

defendant was a dangerous offender, that consecutive sentencing reasonably relates to the severity of this offense, and that the defendant needs to be incarcerated to protect society from his future criminal conduct. We agree. The defendant is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

 

 

_____

JOSEPH M. TIPTON, JUDGE